United States District Court
Southern District of Texas
**ENTERED**
August 03, 2026
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SHELBY LEE WILLIAMS, *et al.*,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:19-CV-02828** |
| | § | |
| **CENIKOR FOUNDATION, *et al.*,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM & ORDER

Before the Court is Defendant Cenikor Foundation ("Cenikor")'s Motion for Partial Summary Judgment (ECF No. 87). Cenikor moves for summary judgment on all claims brought by Plaintiffs Shelby Lee Williams and Randy Edward Pouncy. For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** the Motion.

## I. BACKGROUND

### A. Procedural History

This case has a lengthy history before this Court. To summarize briefly, Plaintiffs Williams and Pouncy first filed this suit in 2019 as a collective action under the Fair Labor Standards Act ("FLSA"). *See* ECF No. 1. In February of 2020, the case was consolidated with *Klick v. Cenikor Foundation* (No. 4:19-cv-01583). *See* ECF No. 32. Plaintiffs sought to recover minimum wage and overtime compensation from Cenikor for allegedly unpaid labor performed as part of Cenikor's substance abuse treatment program.

In May of 2021, Plaintiffs Williams and Pouncy moved to sever this case, opting to proceed on their claims individually rather than through a collective action. *See* ECF No. 43. This Court granted Plaintiffs' request for severance and this case proceeded as a separate action. *See* Minute Entry of July 6, 2021. The case was subsequently stayed, on parties' joint motion, from August 2022 until May 2025, pending an interlocutory appeal in *Klick* that determined the proper legal standard through which to analyze the employee status of participant workers in a drug rehabilitation program. *See* ECF No. 60. The Fifth Circuit issued its decision in *Klick* on February 9, 2024. *Klick v. Cenikor Foundation*, 94 F.4th 362 (5th Cir. 2024) (remanding for application of alternative legal standard).[1]

The Court lifted the stay in this case on May 7, 2025. It subsequently granted Defendant's motion to exclude the eight would-be plaintiffs who had filed "opt-in" notices when the case was proceeding as a collective action, but granted Plaintiffs leave to amend their complaint to include these "opt-in" plaintiffs as parties. Cenikor has now moved to dismiss the new plaintiffs' claims and moved for summary judgment on Plaintiffs Williams' and Pouncy's claims.

**B. Relevant Factual Background**

The Court will summarize the relevant facts, drawing all "reasonable inferences" in favor of Plaintiffs Williams and Pouncy. *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007). Except as noted, the following facts are not disputed. Because the Court ultimately concludes that Mr. Pouncy's claims are barred by the statute of limitations, it will focus on those facts that are relevant

[1] *Klick* has since been dismissed by stipulation.

to Mr. Williams. Some of these facts are discussed in more detail in the relevant sections of this opinion.

Cenikor is a non-profit rehabilitation center that assists individuals struggling with alcohol and drug addiction. ECF No. 87, Ex. A ("Kuhlman Decl.") at ¶ 3. At issue in this case is Cenikor's long-term in-patient treatment program, which, among other things, requires participants to work for "community business partners" (outside businesses) such as General Plastics, the Southern Floral Company, and the Houston Rodeo and Livestock Association. *See* ECF No. 87, Ex. B ("Williams Depo.") at 234-37. Cenikor billed these outside businesses directly for the labor performed by Cenikor participants. Kuhlman Decl. at ¶ 18. It always charges hourly rates at or above the federal minimum wage. *Id*. Cenikor made over seven million dollars in 2017 from tis participants' labor with outside businesses. ECF No. 99, Ex. B ("Audit") at 6. Participants' vocational services generated a similar amount of revenue in 2018. *Id*. at 7. This revenue goes back into the Foundation to help offset its operational expenses. Kuhlman Decl. at ¶ 11. This revenue is not sufficient to fund the entirety of Cenikor's operations. *Id*. While enrolled at Cenikor, participants receive access to clinical services as well as basic personal needs such as housing, food, and medical care. *Id*. at ¶ 7. Cenikor requires eligible participants to apply for government assistance and assign those benefits to Cenikor in order to offset the program's food costs. *Id*. at ¶ 12.

Cenikor's treatment program proceeds in three phases: orientation, primary treatment, and re-entry. *Id*. at ¶ 5. The orientation phase typically lasts approximately thirty days during which participants familiarize themselves with the rules of the community, participate in group and individualized counseling sessions, and work with counselors to develop an individualized treatment plan. *Id*. The primary phase typically lasts about 18 months. *Id*. at ¶ 6. During the primary

phase, participants begin working for outside employers, which Cenikor refers to as "vocational work therapy." *Id*. According to Cenikor, "[p]articipation in work therapy is critical to a patient's likelihood for success and long-term sobriety because the patients learn responsibility, the importance of work, and self-reliance, among other things." *Id*. Participants are not paid for the work they performed for outside businesses during this phase. During the re-entry phase, participants independently obtain employment from a third party, for which they are paid directly. Williams Depo. at 68. They also pay rent to Cenikor during this phase. *Id*. at 89. Plaintiffs are seeking compensation under the FLSA only for work performed during the primary treatment phase of the program.

Upon admission to the program, participants were required to sign numerous acknowledgements and agreements. As relevant here, these documents included statements that "Cenikor provides a comprehensive therapeutic treatment program and includes work assignments as a part of rehabilitation[,]" that "my work assignment is part of my treatment[,]" and that ""[r]esidents receive no monetary compensation for assigned responsibilities in the facility, or any on-the-job training during the primary treatment phase." *See* ECF No. 87, Exs. B-129, B-130. The agreements further stated that "I. . . understand that under no circumstances can Cenikor be under any obligation to me; that I am a beneficiary and not an employee." Ex. B-130.

Plaintiff Randy Pouncy enrolled in Cenikor's residential treatment program on September 1, 2015. Kuhlman Depo. at ¶ 16. Mr. Pouncy finished the primary treatment phase of Cenikor in February of 2017. ECF No. 87, Ex. C. ("2021 Pouncy Depo.") at 50-51. He left the program altogether in June of 2017, while he was participating in the re-entry phase. *Id*. at 16.

Plaintiff Shelby Williams enrolled in Cenikor in September of 2016, after being arrested for possession of a controlled substance and driving while intoxicated (DWI). Williams Depo. at 85, 102-03. He finished the primary treatment phase in October of 2017 and successfully graduated from Cenikor in September of 2018. *Id*. at 26, 31. Mr. Williams enrolled in Cenikor voluntarily (that is, not as a result of a court order). *Id*. at 59-60. He testified that he enrolled to "try to get on track with [his] life." *Id*. at 51, 60-61. On February 27, 2017, after he had been enrolled in Cenikor for five months, Mr. Williams was sentenced to ten years of imprisonment, which was suspended in favor of ten years of probation. *Id*. at 103-04. As a condition of his probation required that he successfully complete Cenikor. ECF No. 87, Ex. H (Court Transcript) at Vol. 2, p. 6. Prior to enrolling in Cenikor, Mr. Williams used marijuana every day from the age of thirteen. Williams Depo. at 56-57. He also struggled to maintain steady employment. *Id*. at 31. Since graduating from Cenikor in 2018, he has not used marijuana or any other drug and has maintained steady employment. *Id*. at 57, 31.

Mr. Williams and Mr. Pouncy paid modest admissions fees in order to attend the Cenikor program. Kuhlman Decl. at ¶ 17. While there is dispute as to which forms Plaintiffs actually signed, Plaintiffs' signatures appear on the aforementioned agreements regarding the lack of compensation for their work as part of the "vocational therapy" program. According to Mr. Williams, he was told by a Cenikor employee upon admission that Cenikor would save the paychecks he earned through his work without outside employers during the primary treatment phase and give him that money during the re-entry phase. Williams Depo. at 68. Cenikor disputes that any employee made such a statement. *See* ECF No. 87, Ex. E ("Reeves Depo.").

## II. LEGAL STANDARD

Summary judgment under Rule 56 "is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting FED. R. CIV. P. 56(c)). A genuine issue as to a material fact arises "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all "reasonable inferences . . . in favor of the nonmoving party, but the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence.'" *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (quoting *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007)).

"[T]he movant bears the initial responsibility of demonstrating the absence of a genuine issue of material fact with respect to those issues on which the movant bears the burden of proof at trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718 (5th Cir. 1995). "For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Id.* at 718–19.

## III. ANALYSIS

Cenikor raises multiple arguments in support of its Motion for Summary Judgment. First, it argues that Plaintiffs cannot meet their burden to show that they were employees of Cenikor under the primary beneficiary test. In the alternative, Cenikor argues (1) that there is no evidence

that any violation of the FLSA was "willful," meaning that a two-year statute of limitations applies to Plaintiffs' claims and (2) that the Court should decline to award Plaintiffs liquidated damages because Cenikor acted in good faith. Because the applicable statute of limitations question is for Mr. Pouncy's claims, the Court addresses the question of willfulness before turning to the question of whether a jury could conclude that either Plaintiff was an employee under the FLSA.

### A. Evidentiary Objections

Prior to addressing the Motion for Summary Judgment, it is necessary to address Plaintiffs' objections to Cenikor's summary judgment evidence. Specifically, Plaintiffs object to Matthew Kuhlman's Declaration (ECF No, 87. Ex. A) and Matthew Kuhlman's Deposition (ECF No. 87, Ex. G) on the basis that neither exhibit was disclosed to Plaintiffs prior to Cenikor's filing of the Motion for Summary Judgment. Plaintiffs also note that Kuhlman's deposition was taken in the *Klick v. Cenikor* case. Under the Federal Rules of Civil Procedure, "[a] deposition lawfully taken. . . in any federal- or state-court action may be used in a later action involving the same subject matter between the same parties, or their representatives or successors in interest, to the same extent as if taken in the later action." FED. R. CIV. PRO. 32(a)(8). Plaintiffs assert that they were not parties in *Klick* at the time that Kuhlman's deposition was taken.

Plaintiffs' objections to Kuhlman's deposition are without merit. As Defendant points out, Mr. Kuhlman's deposition was noticed by the consolidated Plaintiffs in *Klick* on May 21, 2021, and took place on June 25, 2021. *See* ECF No. 100, Ex. K (Kuhlman Deposition Notice); ECF No. 87, Ex. G (Kuhlman Depo.). Plaintiffs' claims were not severed from *Klick* until July 6, 2021. *See* Minute Entry of July 6, 2021. Contrary to their assertions, Plaintiffs were therefore parties in *Klick* at the time the deposition was taken, and the deposition is admissible in this action under Rule

32(a)(8). Moreover, Plaintiffs' counsel, Curt Hesse, was actually present at Kuhlman's deposition. *See* Kuhlman Depo. at 1-2, 56:18-57:8 (Mr. Hesse's appearance). Plaintiffs thus cannot claim to be prejudiced by Cenikor's reliance on the deposition.

The Court also overrules Plaintiffs' objections to Mr. Kuhlman's declaration. While Plaintiffs correctly point out that parties must produce "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses," FED. R. CIV. PRO. 26(a)(1)(A)(ii), Cenikor complied with this rule by identifying Mr. Kuhlman in its initial disclosures. *See* ECF No. 100, Ex. J. Plaintiffs point to no authority for the proposition that a party is required to disclose every summary judgment affidavit from a previously disclosed witness prior to filing a Motion for Summary Judgment, and the Court declines to impose such a requirement.

**B. Plaintiffs' Additional Arguments**

The Court also pauses to address other arguments put forward by Plaintiffs that do not concern the merits of the Motion for Summary Judgment.

First, Plaintiffs argue that even if Cenikor has met its summary judgment burden, the Court should deny the Motion because "the better course" is to proceed to trial. *See* ECF No. 99 at 12-13. This argument is based on outdated legal authority and misstates the applicable law. *See* FED. R. CIV. PRO. 56(a) ("The court *shall* grant summary judgment if the movant shows that there is no genuine dispute as to any material fact.") (emphasis added). The Court gives it no weight.

Next, Plaintiffs argue that the Motion should be denied because Cenikor's answer did not adequately allege its good-faith defenses. Cenikor's answer, filed in 2021, alleged two affirmative

defenses based on good faith. First, it stated that "Plaintiffs are not entitled to any liquidated damages because Defendant acted in good faith and had reasonable grounds for believing that any alleged acts or omissions did not violate the FLSA." ECF No. 37 at ¶ 85. Although it does not move for summary judgment on this basis, Cenikor also asserted that Plaintiffs claims are barred because "any action taken in connection with Plaintiffs' compensation was done in good faith conformance with and reliance upon written and/or other administrative regulations, orders, rulings, approvals, interpretations, practices or enforcement policies of the Wage and Hour Division of the United States Department of Labor and other related administrative agencies, including state agencies." *Id*. at ¶ 96. Plaintiffs never moved to strike these affirmative defenses and did not move for a more definite statement. Under these circumstances, the Court finds that Plaintiffs had "fair notice" of these affirmative defenses. FED. R. CIV. PRO. 8(e).

Finally, Plaintiffs argue that the Court should defer ruling on the questions of willfulness and good faith until after trial. The Court declines to defer ruling on the question of willfulness. It is Plaintiffs' burden to put forward evidence sufficient from which a jury could conclude that Cenikor acted willfully, and resolution of this question has a dispositive impact on one Plaintiff's claims. The mere fact that the question is fact-heavy and intertwined with liability does not relieve Plaintiffs of their burden to overcome summary judgment by presenting some evidence from which a jury could conclude that Cenikor acted willfully.

The Court agrees with Plaintiffs as to Cenikor's good-faith defense, however. Cenikor has argued that the Court has discretion to decline to award Plaintiffs liquidated damages if "the act or omission giving rise to [the lawsuit] was in good faith and that [Cenikor] had reasonable grounds for believing that [its] act or omission was not a violation of the [FLSA]." 29 U.S.C. § 260. But as Plaintiffs correctly point out, the Court may still decide to impose liquidated damages even if a

defendant successfully establishes a § 260 good-faith defense. *Nero v. Industrial Molding Corp.*, 167 F.3d 921, 928 (5th Cir. 1999) (stating that "even if a trial court is satisfied that an employer acted both in good faith and reasonably, it may still award liquidated damages [under the FLSA] at its discretion in any amount up to that allowed by 29 U.S.C. § 216(b).") (internal citation omitted). Because the question of good faith is material only to the question of how the Court should exercise its discretion to impose damages, not liability, the Court declines to address Cenikor's good faith defense at this time.

### C. The Applicable Statute of Limitations

The Court begins by addressing the question of which statute of limitations applies, and the impact of the relevant statute of limitations on Plaintiffs' claims. Because the Court concludes that Plaintiffs have presented no evidence that any violation of the FLSA was "willful," a two-year statute of limitations applies to Plaintiffs' claims. While Mr. Williams filed suit within two years of the latest date on which his cause of action accrued, his claims may proceed with respect to the portion of his vocational therapy that occurred on or after May 22, 2017. But because Mr. Pouncy's claims fall outside of the two-year statute of limitations, Cenikor is entitled to summary judgment on his claims.

#### i. Plaintiffs have provided no evidence that any violation of the FLSA was willful.

In general, an action under the FLSA must commence "within two years after the cause of action accrued." 29 U.S.C. §§ 255(a). However, "a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." *Id*. The plaintiff bears the burden of proving that an employer's violation was willful. *See Cox v. Brookshire Grocery*

*Co.*, 919 F.2d 354, 355—56 (5th Cir. 1990). Cenikor argues that Plaintiffs have produced no evidence of willfulness, meaning that the two-year statute of limitations applies to their claims.

A violation of the FLSA is willful if the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Ikossi-Anastasiou v. Bd. of Supervisors of La. State Univ.*, 579 F.3d 546, 552 (5th Cir. 2009). Examples of evidence that courts have found probative of willfulness include "(1) admissions that an employer knew its method of payment violated the FLSA prior to the accrual of the action; (2) continuation of a pay practice without further investigation after being put on notice that the practice violated the FLSA; (3) earlier violations of the FLSA that would put the employer on actual notice of the Requirements of the FLSA; (4) failure to keep accurate or complete records of employment; and (5) prior internal investigations which revealed similar violations." *Bingham v. Jefferson Cnty., Tex.*, No. 1:11-CV-48, 2013 WL 1312563, at *14 (E.D. Tex. Mar. 1, 2013), *report and recommendation adopted as modified*, No. 1:11-CV-48, 2013 WL 1312014 (E.D. Tex. Mar. 27, 2013) (collecting cases).

Here, Plaintiffs assert that "there is evidence that Cenikor received complaints about not paying Williams and Pouncy, had a history of litigation regarding the Program, caught the attention of members of congress and flaunted regulations specifically promulgated to prevent the exploitations of program participants." ECF No. 99 at 37. However, they do not point to any specific evidence in support of these claims, and the Court is not persuaded.

While there is evidence that both Williams and Pouncy expressed dissatisfaction with their lack of compensation during the primary treatment phase of the Cenikor program, this does not constitute evidence that Cenikor knew or should have known that its program violated the FLSA. The question is not whether Cenikor was aware that its patients were not paid for their work during

the primary treatment phase (which it clearly was), but rather whether Cenikor knew that this arrangement violated the FLSA. As Cenikor has pointed out, it structured its "vocational therapy" program around legal authority from the Ninth Circuit which found that a similar program involving the Salvation Army did not violate the FLSA because program participants were not "employees." *See Williams v. Strickland*, 87 F.3d 1064, 1067 (9th Cir. 1996). Under these circumstances, Williams and Pouncy's complaints about the fact that they were not paid do not constitute evidence of willfulness.

Plaintiffs' claims that Cenikor had a "history of litigation" regarding its vocational therapy program and that the program "caught the attention of members of congress" also do not constitute evidence of willfulness. At the outset, Plaintiffs do not specify the "history of litigation" to which they refer, and submit no evidence of prior lawsuits against Cenikor. Since it is Plaintiffs' burden to demonstrate willfulness, this vague gesturing will not suffice to overcome summary judgment. To the extent Plaintiffs refer to the *Klick v. Cenikor* litigation, that case was filed in 2019, well after the alleged FLSA violations in this case occurred. Similarly, Plaintiffs have submitted a letter from Senators Elizabeth Warren and Tammy Baldwin to the Government Accountability Office (GAO), requesting that GAO conduct an investigation into mandatory vocational requirements at drug and alcohol rehabilitation facilities, including whether such programs violate the FLSA. *See* ECF No. 99, Ex. C. But even assuming this letter (which does not specifically mention Cenikor) could constitute evidence of a willful violation, it cannot do so in this case because it is dated November 19, 2020—several years after the alleged FLSA violations occurred. To the extent

Plaintiffs rely on an April 24, 2019 Reveal News article cited earlier in their Response, this too was published after the alleged violations.[2] *See* ECF No. 99 at 15-16.

Finally, Plaintiffs point to various Texas regulations governing state-licensed chemical treatment facilities. *See* 26 Tex. Admin. Code § 564.16 ("[P]rovider[s] shall not exploit relationships with individuals receiving services for personal or financial gain of the provider or its personnel."); 26 Tex. Admin. Code § 564.705(b) ("The facility shall not require clients to participate in any fund raising or publicity activities for the facility."); 26 Tex. Admin. Code § 564.705(c) ("The facility and its personnel shall not enter into a business or personal relationship with a client. . . until at least two years after services to the client cease."); 26 Tex. Admin. Code § 564.701(a)(4) ("You have the right to be free from abuse, neglect, and exploitation."). But these regulations do not pertain to a vocational work therapy program such as the one at issue in this case, and do not serve as evidence of a willful violation of the FLSA.[3]

[2] Defendant has objected to the Reveal News article and the letter from Senators Warren and Baldwin as inadmissible hearsay and nor properly authenticated. The Court agrees with Defendant that these documents constitute hearsay to the extent that Plaintiffs seek to use them to prove the truth of what they assert, namely, facts about Cenikor's labor practices. Presuming Plaintiffs could authenticate these documents at trial, they would theoretically be admissible to prove that Cenikor had notice that its vocational therapy program might violate the FLSA. But since both of these documents were created only after the alleged violations in this case occurred, they are not relevant to that purpose here.

[3] Plaintiffs also cite provisions of the regulations governing Texas Department of Mental Health and Mental Retardation facilities and psychiatric hospitals. *See* 26 Tex. Admin. Code § 320.7(27) (stating that persons receiving mental health services from department facilities have "[t]he right to fair compensation for labor performed for the department facility. . . in accordance with the Fair Labor Standards Act."). But this regulation pertains to facilities run by Texas Department of Mental Health and Mental Retardation, not non-profit drug and alcohol treatment facilities like Cenikor, and, in any case, is irrelevant to the question of willfulness.

Because Plaintiffs have not produced any evidence from which a jury could reasonably conclude that the purported violations of the FLSA were willful, a two-year statute of limitations applies to these plaintiffs' FLSA claims.

**ii. Mr. Pouncy's claims are barred by the statute of limitations.**

Plaintiffs Williams and Pouncy filed this case on May 22, 2019. *See* ECF No. 1 (Complaint). Mr. Pouncy left Cenikor in June of 2017, while he was participating in the re-entry phase. 2021 Pouncy Depo. at 16. However, he graduated from the primary treatment phase of the program in February of 2017. *Id*. at 50-52. From that point onwards, he was paid directly for his labor by third-party employers. *Id*. Since it is undisputed that Plaintiffs' FLSA claims apply only to the unpaid vocational therapy they performed during the primary phase, Mr. Pouncy's claims fall outside the two-year statute of limitations. *See id.* at 52-53.

Mr. Williams, on the other hand, was participating in unpaid vocational therapy at Cenikor through at least October of 2017. Williams Depo. at 26. The portion of his FLSA claims that occurred after May 22, 2017 therefore falls within the two-year statute of limitations.

**D. Mr. Williams' Employee Status**

The Court turns to the question of whether Plaintiffs' evidence is sufficient to create a factual dispute as to whether Mr. Williams was an "employee" of Cenikor for the purposes of the FLSA.

**i. The Primary Beneficiary Test**

In *Klick v. Cenikor*, the Fifth Circuit held that "a primary beneficiary test provides a helpful framework for discerning employee status" in the context of a drug treatment program that requires

participants to work for third-party employers without pay. *Klick v. Cenikor Found.*, 94 F.4th 362, 372 (5th Cir. 2024). This test is "commonly applied when evaluating whether volunteers, trainees, and interns are 'employees' under the FLSA." *Id.* at 370. As the name implies, the key inquiry is whether the participant or the employer received the primary benefit from the relationship. "Non-exhaustive factors to consider include the plaintiffs' expectation of compensation, the therapeutic value of the Program, whether the relationship displaces paid employees, and any other considerations that may 'shed light on which party primarily benefits from the relationship.'" *Id.* at 372.

Cenikor correctly points out that every Circuit to consider the question has concluded that participants in similar rehabilitation programs are not employees under the primary beneficiary test. *See Williams v. Strickland*, 87 F.3d 1064, 1067 (9th Cir. 1996); *Vaughn v. Phoenix House Found., Inc.*, 957 F.3d 141, 144 (2d Cir. 2020); *Fochtman v. Hendren Plastics, Inc.*, 47 F.4th 638, 641 (8th Cir. 2022); *Armento v. Asheville Buncombe Cmty. Christian Ministry, Inc.*, 856 F. App'x 445, 453 (4th Cir. 2021). This does not decide the question, however. The primary beneficiary test is an individualized, "fact-intensive inquiry which requires a careful evaluation of the totality of the circumstances." *Klick*, 94 F.4th at 372. "While the determination of whether an individual is an 'employee' is a matter of law, there are often associated factual inquiries required before such a determination can be made." *Id.* at 369. The Court therefore rejects Cenikor's implicit argument that a participant in any "vocational therapy" program at a rehabilitation facility—no matter how exploitative—is not an employee under the FLSA. Instead, the Court proceeds to examine the "economic reality between [Cenikor and Mr. Williams]" based on the evidence before it in this case. *Id.*

This case is unique from all but one of the aforementioned Circuit Court cases in that Plaintiffs are not seeking compensation for work performed within Cenikor's facilities, but rather for third-party businesses which paid their wages directly to Cenikor. These wages in turn helped fund Cenikor's operations, including food, housing, and counseling services for program participants. Under these circumstances, "it is not possible to declare that the arrangement benefits solely one party or another." *Fochtman*, 47 F.4th at 646. But the Court concludes that, viewing the evidence in the light most favorable to Mr. Williams, a reasonable jury could find that Cenikor was the primary beneficiary of the employment relationship. The Court will address each factor in turn.

**ii. Expectation of Compensation**

The evidence is sufficient for a reasonably jury to conclude that Mr. Williams expected to be compensated for his work for third-party businesses during the primary treatment phase. Mr. Williams stated during his deposition that:

> Steve Reeves, the guy in admissions—according to him when I signed up, he told me that I would go to work in the first phase of the program and that they would save my checks. And whenever I get to re-entry, they would give me that money plus the money that I saved while I'm in re-entry.

Williams Depo. at 68.

According to Mr. Williams, Mr. Reeves made these statements during Mr. Williams' in-person intake meeting. *Id*. at 95. While Mr. Williams remembered signing some of the intake agreements that bear his signature, he denied signing those documents stating that he would receive no monetary compensation for the work performed as part of his vocational therapy. *See id.* at 122-23 (acknowledging having signed some documents); *id*. at 144-45; 146; 157; 161 (denying having

signed some documents).[4] Mr. Williams further testified that he complained to Dwayne Parr, a Cenikor employee in the financial services office, when he did not receive the money he had believed was set aside from him. *Id*. at 71-72. According to Mr. Williams. Mr. Parr responded, "Are you sober?" to which Mr. Williams responded in the affirmative. *Id*. at 73. Mr. Parr then stated, "There you go." *Id*. In his interrogatory responses, Mr. Williams similarly maintained that a Cenikor employee had told him that he would be compensated for his vocational therapy work, but stated that the employee was named Anthony King. *See* ECF No. 87, Ex. B-136.

It is well-established that "[t]he fact that this testimony is self-serving is not, in and of itself, sufficient to defeat summary judgment." *Matter of Highland Cap. Mgmt., L.P.*, 116 F.4th 422, 431 (5th Cir. 2024) (citing *United States v. Stein*, 881 F.3d 853, 859 (11th Cir. 2018)). Nonetheless, Cenikor asks the Court to disregard Mr. Williams' statements regarding his expectation of compensation because they are internally contradictory. But while there are narrow circumstances under which "a court may decide that there are so many inconsistencies [in a witness' statements] that the testimony does not need to be put before a jury," Mr. Williams' statements are not so inconsistent as to fall within this exception. *Matter of Highland Cap. Mgmt., L.P.*, 116 F.4th 422, 432 (5th Cir. 2024). While Mr. Williams' statements are inconsistent with regard to the name of the Cenikor employee who told him that he would be paid for his vocational therapy work, his deposition testimony on this point is detailed and specific. A reasonable jury could credit Mr. Williams' testimony that a Cenikor employee told him that he would receive

[4] Cenikor also argues that Mr. Williams' testimony about his expectation of compensation is insufficient to defeat summary judgment because it is inconsistent with the documents bearing his signature which state that he would "receive no monetary compensation" and that he was a beneficiary rather than an employee of Cenikor. *See* Ex. B-129; Ex. B-130. But while this is certainly something a jury could consider in evaluating the credibility of Mr. Williams' testimony, it is insufficient for the purposes of summary judgment.

payment for the work he performed with outside businesses during the primary treatment phase.[5] This factor therefore weighs in favor of employee status.

**iii. The Therapeutic Value of the Program**

Cenikor next argues that Mr. Williams cannot claim employee status because he benefitted substantially from his participation in Cenikor's rehabilitative program, including through achieving sobriety. While this factor presents a close question, the Court disagrees.

It is clear from the summary judgment evidence that Mr. Williams did benefit substantially from certain elements of Cenikor's rehabilitative program, particularly from group and individual counseling. *See, e.g.*, Williams Depo. at 91-92 (discussing benefits of counseling). It is also uncontested that enrollment at Cenikor helped Mr. Williams overcome his addiction and achieve sobriety for the first time in his adult life, the value of which Mr. Williams characterized as "unlimited." *Id*. at 171. The Court does not seek to diminish the therapeutic benefits of other aspects of Cenikor's in-patient treatment program.

The benefits of the "vocational therapy" aspect of Cenikor's program specifically are much less clear, however. First, the available evidence suggests that Mr. Williams was often required to work grueling hours for Cenikor's community business partners, sometimes leaving him little time for participation in rehabilitative activities outside of work. During his deposition, Mr. Williams testified that he regularly worked 60 hours per week or more for third-party employers as part of his vocational therapy for Cenikor. *See* Williams Depo. at 226 (testifying that he worked from 6:00

[5] This case is distinguishable from *Williams v. Strickland*, in which the Ninth Circuit affirmed summary judgment despite the plaintiff's testimony that he "believed he was in an employment relationship" because here, Mr. Williams testified that a Cenikor employee affirmatively represented to him that he would be paid for his work with third-party businesses. 87 F. 3d at 1067. This testimony is therefore different from the *Williams* plaintiff's assertion of a "unilateral state of mind, which was not expressed to anyone at the time of his admittance." *Id*.

pm to 3:00 am seven days per week for the Houston Rodeo and Livestock Show); *id*. at 235-36 (testifying that he worked from 5:00 am to 5:00 pm six days per week at Pasadena Skid & Pallet); *id*. at 236-37 (testifying that he worked from 8:00 am to 6:00 pm six days per week at the Houston Strawberry Festival); *id*. at 237 (testifying that he worked from 10:00 pm to 8:00 am six days per week at the Southern Floral Company). For at least one employer, Mr. Williams worked nearly 100 hours per week. *Id*. at 207; 223 (testing that he worked from 5:00 pm to 7:00 am seven days per week at Simos). For other employers, Mr. Williams worked between 40 and 55 hours per week. *Id*. at 233 (testifying that he worked from 8:00 am to 4:00 pm five days per week at General Plastics); *id*. at 234 (testifying that he worked from 8:00 am to 5:00 pm six days per week at the Houston Golf Association); *id.* at 235 (testifying that he worked from 8:00 am to 4:00 pm five days per week for the Houston Astros).

The Court concludes that the high number of hours worked by Mr. Williams weighs in favor of employee status. The evidence suggests that Mr. Williams gained benefits such as an improved work ethic and on-the-job training from his participation in vocational therapy with third-party employers.[6] *See id.* at 191 ("Q. And you did feel like you developed a better work ethic while you were in the Cenikor program? A. Yes, ma'am."); *id* at 194 (Mr. Williams agreeing that he developed job skills through the vocational therapy that he could utilize once he entered the re-entry phase). But "the presence of a rehabilitative element does not preclude an employment relationship" between a participant and a drug rehabilitation facility. *Williams*, 87 F.3d at 1067. Here, a jury could reasonably conclude that vocational therapy had diminishing returns for Mr. Williams when he was required to work in excess of 50 or 60 hours per week. Indeed, Mr.

[6] Mr. Williams also received certain work-related certifications while at Cenikor, but these were not provided through or during his work for third-party employers. *See* Williams Depo. at 37; *id.* at 41; *id*. at 44.

Williams' work hours were sometimes so extreme that he was required to skip counseling sessions. *Id*. at 226 (testifying that he did not attend counseling while working at the Houston Rodeo because it conflicted with his work hours). Additionally, while Mr. Williams likely received the same benefits whether he worked 40 or 80 hours per week, Cenikor received overtime pay from its community business partners when Mr. Williams' hours exceeded 40 hours per week. This evidence could lead a jury to reasonably conclude that Cenikor, rather than Mr. Williams, gained the greater benefit from his vocational therapy.

The long hours and types of jobs worked by Mr. Williams also distinguish this case from other cases in which courts have concluded that participants in similar rehabilitative programs were not employees. For example, in *Williams v. Strickland*, the plaintiff "engaged in work therapy on a full-time basis" during his stay at the Salvation Army. 87 F.3d at 1065. His work included restoring furniture for sale at the Salvation Army store and sorting food and clothing donations. *Id*. In *Vaughn v. Phoenix House Foundation, Inc.*, the plaintiff worked 48 hours per week in various jobs within the treatment facility, including serving as a "point person" for other patients, working in the garbage room, and working at the facility's warehouse. No. 14-CV-3918 (RA), 2019 WL 568012, at *1 (S.D.N.Y. Feb. 12, 2019), *aff'd sub nom. Vaughn v. Phoenix House New York Inc.*, 957 F.3d 141 (2d Cir. 2020). By contrast, Mr. Williams often worked 60 or more hours per week for third-party employees who paid his wages directly to Cenikor.[7] Like the plaintiffs in *Williams* and *Vaughn*, Mr. Williams also performed less formal work within Cenikor, such as mowing the lawn, acting as a barber for other participants, and acting as a "verbal coordinator"

[7] Although the Eighth Circuit's opinion in *Fochtman* dealt with a more comparable program in which program participants performed work for outside for-profit businesses rather than directly for the foundation, the Court focused its decision on the plaintiffs' lack of expectation of compensation and did not examine the number of hours worked. 47 F.4th at 645.

responsible for meting out consequences for other participants to violated community rules. *See* Williams Depo. at 130-32. But unlike those plaintiffs, Mr. Williams is not seeking compensation for this work. Indeed, he testified that these roles helped him feel like he was giving back to the Cenikor community, which was important to him. *Id*. at 141-42.

Mr. Williams himself summarized the situation when asked during his deposition whether he agreed that Cenikor improved his life. He replied: "Yeah, they did, but they also made me work for free, too." Williams Depo. at 85-86. Viewing the evidence in the light most favorable to Mr. Williams, the Court agrees that while Mr. Williams clearly benefited from certain aspects of Cenikor's program, the benefits he reaped from his unpaid labor with third-party employers were minimal. Cenikor, on the other hand, made over seven million dollars in both 2017 and 2018 from the labor performed with outside businesses by participants like Mr. Williams. The opposite conclusion would require the Court to assume that a drug rehabilitation program can demand a virtually unlimited number of hours of unpaid labor from its patients, regardless of the therapeutic benefits of this labor, so long as the patient is ultimately successful in overcoming his addiction.

**iv. Displacement of Other Employees**

The next factor in the primary beneficiary test is "whether the relationship [between the parties] displaces paid employees." *Klick*, 94 F.4th at 372. In some ways, this factor is a poor fit for the circumstances of Mr. Williams' work. It is undisputed that Cenikor participants did not displace paid employees of Cenikor. While participants like Mr. Williams clearly displaced paid employees of the third-party for-profit businesses for which they worked during the primary treatment phase, these third-party employers *were* paying Cenikor participants—these wages were just paid to Cenikor rather than to the participants themselves. The third-party employers therefore

did not benefit from unpaid labor by employing Mr. Williams and other Cenikor participants, which is part of what the FLSA seeks to avoid.

The Court therefore concludes that this factor weighs slightly in favor of Cenikor. However, the Court does not give this factor much weight in determining who was the primary beneficiary of the relationship between Mr. Williams and Cenikor because it centers on the benefits to the third-party businesses, rather than the benefits to Cenikor.

**v. Other Considerations**

Finally, the Court examines "other considerations that may 'shed light on which party primarily benefits from the relationship.'" *Klick*, 94 F.4th at 372. Cenikor points to several other factors that it argues weigh against a finding of employee status. Most persuasively, it argues that Mr. Williams entered Cenikor for his own personal purposes—namely, to get sober and turn his life around—rather than for the purpose of making money. Cenikor also points out that Mr. Williams "avoid[ed] a ten-year prison sentence" by participating in Cenikor. ECF No. 87 at 25.

Cenikor is correct that "[a]n individual who, 'without promise or expectation of compensation, but solely for his personal purpose or pleasure, worked in activities carried on by other persons either for their pleasure or profit,' is outside the sweep of the [FLSA]." *Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 295 (1985) (quoting *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152 (1947)). It is also true that Mr. Williams enrolled in Cenikor to "try to get on track with [his] life" after being arrested on drug-related charges, and that he achieved this goal during his two years at Cenikor. Williams Depo. at 51; 56-57. While Mr. Williams entered Cenikor voluntarily, he was later sentenced to probation, which included a condition that he successfully graduate from Cenikor.

While the Court agrees with Cenikor that these facts weigh against employee status, they are not dispositive at summary judgment. For largely the reasons articulated with respect to the therapeutic value of Cenikor's program, the Court concludes that the fact that Mr. Williams entered Cenikor in order to overcome his addiction does not categorically exclude him from compensation under the FLSA. Additionally, while at least one court has found that the fact that participants enrolled in the recovery program as an alternative to incarceration weighed against employee status, this was in the context of determining whether the participants expected compensation. *See Fochtman*, 47 F. 4th 638 at 646 ("[T]he overriding consideration is that the DARP participants undertook the recovery program for their own purposes to avoid imprisonment, and. . . had no reason to expect compensation."). Here, Mr. Williams has introduced evidence that he did expect to be paid for his labor with third-party businesses when he signed up for Cenikor, that he often worked in excess of 60 hours per week, that Cenikor monetarily benefited from this labor, and that he would have enjoyed the same rehabilitative benefits from his participation in Cenikor had he not been required to work these lengthy hours. While a jury could certainly look to Mr. Williams' motives for enrolling in Cenikor in determining the credibility of his testimony that he expected compensation, the fact that he was required to complete Cenikor as part of his probation does not bar a finding of employee status. If this were so, people in Mr. Williams' position would have no choice but to work without pay under even the most exploitative conditions or go to prison. Although this situation admittedly presents a close case, the Court concludes that a factual dispute remains as to which party primarily benefited from Mr. Williams' vocational therapy.

Cenikor also argues that summary judgment is appropriate because Cenikor's vocational therapy program does not conflict with the principal purposes of the FLSA. Specifically, Cenikor argues that the arrangement did not threaten to depress wages because the third-party businesses

Cenikor partnered with were still required to pay minimum wage and overtime and that Cenikor participants were not dependent on wages to maintain a minimum standard of living because they were guaranteed room and board from Cenikor. But while these are reasonable conclusions from the available evidence, a jury could also reasonably conclude that Cenikor's program does conflict with the FLSA's "goal of outlawing from interstate commerce goods produced under conditions that fall below minimum standards of decency." *Alamo*, 471 U.S. at 296. While Cenikor participants did not work for free from the perspective of the third-party business partners, they were also uniquely vulnerable to exploitation because they did not have the ability to decline to work excessive hours or to quit their jobs without risking expulsion from Cenikor. It is also unclear whether Cenikor's third-party business partners paid the same amount for Cenikor participants' labor as it did for its regular employees, which could in turn depress wages for normal paid employees. In the absence of any concrete evidence to the contrary, a jury could conclude that this arrangement conflicts with the goals of the FLSA.[8]

**vi. Conclusion**

The primary beneficiary test is "a fact-intensive inquiry which requires a careful evaluation of the totality of the circumstances." *Klick*, 94 F.4th at 372. Considering the totality of the evidence in the light most favorable to Mr. Williams, the Court concludes that a jury could reasonably conclude that Cenikor was the primary beneficiary of the work that Mr. Williams performed for

[8] Cenikor also points to the fact that its participants were not guaranteed employment at the end of the program and that the program was tailored to each participants needs and goals. While the lack of guaranteed employment at the end of the program has been considered relevant when using the primary beneficiary test to address the employee status of interns and trainees, the Court does not find it helpful under the facts of this case, given Plaintiffs worked for third-party employers who paid their wages to Cenikor, rather than directly for Cenikor. The Court finds Cenikor's arguments about the tailoring of its program to participants' unique needs repetitive of the arguments about the therapeutic value of the program.

third-party for-profit businesses during the primary treatment phase. Since a factual dispute remains as to Mr. Williams' employee status under the FLSA, summary judgment is unwarranted on this basis.

## IV. CONCLUSION

For the reasons stated herein, Cenikor's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** with regard to all claims by Plaintiff Randy Pouncy, because Plaintiffs have produced no evidence that any violation of the FLSA was "willful" such that Mr. Pouncy's claims would fall within the applicable statute of limitations. The Motion is **DENIED** with respect to all claims by Plaintiff Shelby Williams that accrued on or after May 22, 2017, because a factual dispute remains as to Mr. Williams' status as an employee.

**IT IS SO ORDERED.**

Signed at Houston, Texas on August 3, 2026.

Keith P. Ellison
United States District Judge